Slip Op. 21-106

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| LOGITECH, INC.,<br><br>      Plaintiff,<br><br>  v.<br><br>UNITED STATES,<br>      Defendant. | Before: Leo M. Gordon, Judge<br><br>Court No. 16-00017 |

**OPINION**

[Following trial, holding that subject Webcams and ConferenceCams are classified under HTSUS Heading 8517.]

Dated: August 24, 2021

  Patrick D. Gill and Deborah B. Stern, Sandler, Travis & Rosenberg, P.A., of New York, N.Y., for Plaintiff Logitech, Inc.

  Jamie L. Shookman, Jason M. Kenner, and Peter A. Mancuso, Trial Attorneys, U.S. Department of Justice, Civil Division, Commercial Litigation Branch, New York, N.Y., argued for Defendant United States. On the brief were Brian M. Boynton, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Justin R. Miller, Attorney-in-Charge, International Trade Field Office. Of counsel was Paula S. Smith, Office of the Assistant Chief Counsel, U.S. Customs and Border Protection of New York, N.Y.

  Gordon, Judge: Plaintiff, Logitech, Inc. ("Logitech" or "Plaintiff"), challenges the denial by U.S. Customs and Border Protection ("Customs") of Logitech's protest of Customs' classification of the imported merchandise that fall into two categories: "Webcams" and "ConferenceCams" (collectively, "subject merchandise"), as "television cameras" under subheading 8525.80.3010 of the Harmonized Tariff Schedule of the United States ("HTSUS"), with a duty rate of 2.1 percent ad valorem.

Plaintiff claims that the subject merchandise are properly classified as "other apparatus for the transmission or reception of voice, images or other data, including apparatus for communication in a wired or wireless network" under HTSUS Subheadings 8517.69.0000 (Webcams) and 8517.62.0050 (ConferenceCams), each duty free.

The court has jurisdiction pursuant to 28 U.S.C. § 1581(a) (2018).  For the reasons set forth below, the court enters judgment for Plaintiff that the subject ConferenceCams are classifiable under HTSUS Subheading 8517.62.00 and the subject Webcams are properly classifiable under HTSUS Subheading 8517.69.00.

## I. Background

Plaintiff and Defendant filed cross-motions for summary judgment.  See Pl.'s Mot. for Summ. J., ECF No. 31; Def.'s Cross-Mot. for Summ. J., ECF No. 37.  The court denied the parties' cross-motions for summary judgment, explaining that HTSUS Heading 8517 is a principal use provision, and the court could not grant summary judgment in favor of either party on the fact-intensive principal use factors set forth in United Sates v. Carborundum Co., 63 CCPA 98, 102, 536 F.2d 373, 377 (1976) without it impermissibly finding facts about the principal use of the subject merchandise (particularly given the summary judgment standard requiring the court to draw all reasonable inferences in favor of the non-movant on contested fact issues).  See Memorandum and Order at 2, ECF No. 42.  Before trial, the court delineated the uncontested facts in its Pretrial Order. See Pretrial Order, Schedule C, ECF No. 81 ("Joint Uncontested Facts").  The court held a bench trial on November 20–22, 25, 2019. Trial, ECF No. 83.

After the conclusion of the trial, the parties submitted proposed findings of fact and

conclusions of law.  See Plaintiff's Proposed Findings of Fact and Conclusions of Law,

ECF No. 107 ("Pl.'s FOF & COL"); Defendant's Proposed Findings of Fact and

Conclusions of Law, ECF No. 108 ("Def.'s  FOF" & "Def.'s COL"); Defendant's

Confidential Proposed Findings of Fact, ECF No. 109.  The parties also submitted post-

trial briefs.  See Plaintiff's Post-Trial Brief ("Pl.'s Br."), ECF No. 110; Defendant's

Confidential Post-Trial Brief ("Def.'s Br."), ECF No. 112.[1]

## II. Standard of Review and Legal Framework

The court reviews Customs' protest decisions de novo. 28 U.S.C. § 2640(a)(1)

(2018).  The classification of merchandise involves a two-step inquiry.  ADC Telecomms.,

Inc. v. United States, 916 F.3d 1013, 1017 (Fed. Cir. 2019).  First, the court ascertains

the meaning of the terms within the relevant tariff provisions, which is a question of law;

second, the court determines whether the subject merchandise fits within those terms,

which is a question of fact.  Id.  This case presents both questions of law, the meaning

and scope of HTSUS Headings 8517 and 8525, as well as questions of fact—how the

imported products are principally used.

In actions under 28 U.S.C. § 1581(a), the court reviews Customs' legal

interpretations of the tariff schedule relative to their "power to persuade," United States v.

Mead Corp., 533 U.S. 218, 235 (2001) (citing Skidmore v. Swift & Co., 323 U.S. 134, 140

(1944)).  A corollary is "the rule of construction of revenue statutes whereby unclear or

---

[1] All citations to parties' briefs and other documents on the record are to their public
versions unless otherwise noted.

ambiguous tariff classifications have traditionally been resolved in favor of the importer."

Anhydrides & Chems., Inc. v. United States, 130 F.3d 1481, 1485 (Fed. Cir. 1997) (citing,

inter alia, United States v. Greek Orthodox Church of Evangelismos, 49 CCPA 35, 40

(1962) (referring to the "rule of liberal construction in favor of the importer")).

     For contested factual issues, a statutory presumption of correctness imposes on

Plaintiff the burden of proof.  See 28 U.S.C. § 2639(a)(1) (2000); Universal Elecs., Inc. v.

United States, 112 F.3d 488, 492 n.2 (Fed. Cir. 1997); Chrysler Corp. v. United States,

33 CIT 90, 97, 601 F. Supp. 2d 1347, 1353–54 (2009), aff'd, 592 F.3d 1330 (Fed. Cir.

2010).  Despite its name, the statutory presumption of correctness is not a true evidentiary

presumption governed by Federal Rule of Evidence 301, but rather an "assumption" that

allocates to plaintiff the burden of proof on contested factual issues that arise from the

protest decision.  Universal Elecs., 112 F.3d at 492 n.2; 21B Charles A. Wright & Kenneth

W. Graham, Jr., Fed. Prac. & Proc. Evid. § 5124 (2d ed. 2021) ("Rule 301 does not apply

to 'assumptions'—rules for allocating the burden of proof that are often mislabeled as

'presumptions.' ... the best known include: ... the 'assumption' that official duty has been

regularly performed.").  Plaintiff's burden of proof carries an initial burden of production

(to make an evidentiary proffer), and an ultimate burden of persuasion to establish by a

preponderance plaintiff's operative facts.  Universal Elecs., 112 F.3d at 492.  Importantly,

the presumption does not "change the rule of strict construction of revenue statutes, or

negate judicial responsibility for correct construction of tariff classifications."  Anhydrides

& Chemicals, Inc., 130 F.3d at 1486.  In this action, the presumption of correctness

imposes a burden on Plaintiff to establish by a preponderance that the merchandise is

principally used as other apparatus for the transmission or reception of voice, images or

other data, for communication in a wired or wireless network.

## A. Harmonized Tariff Schedule of the United States

The HTSUS governs the classification of merchandise imported into the United

States.  See Wilton Indus., Inc. v. United States, 741 F.3d 1263, 1266 (Fed. Cir. 2013).

The HTSUS "is organized by headings, each of which has one or more subheadings; the

headings set forth general categories of merchandise, and the subheadings provide

a more particularized segregation of the goods within each category."  Id.  "The first four

digits of an HTSUS provision constitute the heading, whereas the remaining digits reflect

subheadings."  Schlumberger Tech. Corp. v. United States, 845 F.3d 1158, 1163 n.4

(Fed. Cir. 2017).  "[T]he headings and subheadings ... are enumerated in chapters 1

through 99 of the HTSUS (each of which has its own section and chapter notes) ...."

R.T. Foods, Inc. v. United States, 757 F.3d 1349, 1353 (Fed. Cir. 2014).  The HTSUS

"also contains the 'General Notes,' the 'General Rules of Interpretation' ('GRIs'), the

'Additional [U.S.] Rules of Interpretation' ('ARIs'), and various appendices for particular

categories of goods."  Id. (footnote omitted).

The GRIs and the ARIs govern the classification of goods within the HTSUS.

See Otter Prods., LLC v. United States, 834 F.3d 1369, 1375 (Fed. Cir. 2016).  "The GRI

apply in numerical order, meaning that subsequent rules are inapplicable if a preceding

rule provides proper classification."  Schlumberger Tech., 845 F.3d at 1163.  GRI 1

provides, in relevant part, that "classification shall be determined according to the terms

of the headings and any relative section or chapter notes."  GRI 1 (emphasis added).

"Under GRI 1, a court first construes the language of the heading, and any section or chapter notes in question, to determine whether the product at issue is classifiable under the heading."   Schlumberger Tech., 845 F.3d at 1163 (internal quotation marks and citation omitted).   "[T]he possible headings are to be evaluated without reference to their subheadings, which cannot be used to expand the scope of their respective headings." R.T. Foods, 757 F.3d at 1353 (citations omitted).

        "Absent contrary legislative intent, HTSUS terms are to be construed according to their common and commercial meanings, which are presumed to be the same." Well  Luck Co. v. United States, 887 F.3d 1106, 1111 (Fed. Cir. 2018) (internal quotation marks and citation omitted).   "To discern the common meaning of a tariff term, [the court] may consult dictionaries, scientific authorities, and other reliable information sources." Kahrs Int'l, Inc. v. United States, 713 F.3d 640, 644 (Fed. Cir. 2013) (citation omitted).

        "After consulting the headings and relevant section or chapter notes" consistent with GRI 1, the court may consider the relevant Explanatory Notes ("EN").   Fuji Am. Corp. v. United States, 519 F.3d 1355, 1357 (Fed. Cir. 2008).   "The [ENs] provide persuasive guidance and are generally indicative of the proper interpretation, though they do not constitute binding authority."   Chemtall, Inc. v. United States, 878 F.3d 1012, 1019 (Fed. Cir. 2017) (internal quotation marks and citation omitted).

        Once the appropriate heading is determined, the court applies GRI 6 to determine the appropriate subheading.   See Orlando Food Corp. v. United States, 140 F.3d 1437, 1442 (Fed. Cir. 1998).   GRI 6 provides that "the classification of goods in the subheadings of a heading shall be determined according to the terms of those subheadings and any

related subheading notes and, _mutatis mutandis_, to the above [GRIs], on the understanding that only subheadings at the same level are comparable."

The two distinct types of headings in the HTSUS, _eo nomine_ and use provisions, are applicable in this case. Each requires different analyses. Schlumberger Tech., 845 F.3d at 1164 ("We first must assess whether the subject Headings constitute _eo nomine_ or use provisions because different rules and analysis will apply depending upon the heading type."); compare Kahrs Int'l, 713 F.3d 640 (_eo nomine_ analysis), with Aromont USA, Inc. v. United States, 671 F.3d 1310 (Fed. Cir. 2012) (principle use analysis).

An _eo nomine_ provision describes articles by specific names, see Schlumberger Tech., 845 F.3d at 1164, and includes all forms of the named article. Kahrs Int'l, 713 F.3d at 646; ADC Telecomms., Inc. v. United States, 916 F.3d at 1017–18. In an _eo nomine_ analysis, the court first construes the headings at issue as a matter of law by defining the elements of the heading; the court then moves to the second classification step, a factual inquiry, to determine whether the subject merchandise is covered by those elements. See, e.g., R.T. Foods, 757 F.3d 1349; Link Snacks, Inc. v. United States, 742 F.3d 962 (Fed. Cir. 2014).

By contrast, the ARIs govern classification of imported merchandise under _use_ headings. In a _use_ analysis, the court first construes the headings at issue by defining the uses of the goods described by the heading as directed by ARI 1(a) for principal use headings or by ARI 1(b) for actual use headings. For principal use headings, the court then determines as a factual matter the principal use of the subject merchandise

by analyzing the goods using the Carborundum factors to determine whether they fall

within one of the headings:

> [1] use in the same manner as merchandise which
> defines the class; [2] the general physical
> characteristics of the merchandise; [3] the economic
> practicality of so using the import; [4] the expectation
> of the ultimate purchasers; [5] the channels of trade in
> which the merchandise moves; [6] the environment of
> the sale, such as accompanying accessories and the
> manner in which the merchandise is advertised and
> displayed; and [7] the recognition in the trade of this
> use.

Aromont, 671 F.3d at 1313–14 (citing United States v. Carborundum Co., 63 CCPA 98,

536 F.2d 373, 377 (1976)).

### III. Discussion

### A. HTSUS Provisions

The competing Headings are 8517, advocated by Plaintiff, and 8525, advocated

by Defendant:

> 8517   Telephone sets, including telephones for cellular
> networks or for other wireless networks; **other
> apparatus for the transmission or reception of
> voice, images or other data, including apparatus
> for communication in a wired or wireless network
> (such as a local or wide area network)**, other than
> transmission or reception apparatus of heading 8443,
> 8525, 8527 or 8528; parts thereof;

> 8525   Transmission apparatus for radio-broadcasting or
> television whether or not incorporating reception
> apparatus or sound recording or reproducing
> apparatus; **television cameras**, digital cameras and
> video camera recorders:

(Emphasis added).

As explained above, the possible headings are first evaluated <u>without</u> reference to their subheadings.   <u>R.T. Foods</u>, 757 F.3d at 1353.   Defendant contends the subject Webcams and ConferenceCams are "television cameras", whereas Plaintiff contends they are "other apparatus for the transmission or reception of voice, images or other data … for communication in a wired or wireless network."   Both parties agree the term "television cameras" in Heading 8525 is an <u>eo nomine</u> provision, and the term "other apparatus for the transmission or reception of voice, images or other data … for communication in a wired or wireless network" in Heading 8517 is a principal use provision.   Broadly speaking, Heading 8517 covers telephony apparatus and Heading 8525 covers broadcast radio and television apparatus.   These broad contours of the respective headings are helpful to keep in mind when attempting to classify Plaintiff's merchandise: Is it more telephonic, or more television?

Starting with the definition of "television camera" under Heading 8525, the ENs to Heading 8525 describe "television cameras" as "cameras that capture images and convert them into an electronic signal that is: (1) transmitted as a video image to a location outside the camera."   <u>See</u> EN 85.25(B)(1).   This definition is consistent with the technical dictionary definitions of "television camera."   The Institute of Electrical and Electronic Engineers ("IEEE") defines television camera as "a pickup unit used in a television system to convert into electrical signals the optical image formed by the lens."   Joint Uncontested Facts ¶ 56.   Similarly, McGraw-Hill Dictionary of Scientific and Technical Terms (6th ed. 2003) defines "television camera" as:

> The pickup unit used to convert a scene into corresponding electric signals; optical lenses focus the scene to be televised on the photosensitive surface of a camera tube, and the tube breaks down the visual image into small picture elements and converts the light intensity of each element in turn into a corresponding signal.  Also known as a camera.

Thus, the ENs to Heading 8525 and technical definitions[2] describe "television cameras" as devices that capture images, convert them to electronic signals, and transmit them to a remote location.   The subject merchandise perform all three functions—capturing, converting, and transmitting images.  See Pl.'s FOF & COL at ¶ 12; Def.'s FOF ¶ 76; see Tr. at 164:25–165:6 (cross-examination of Plaintiff's engineer, Mr. Aron Rosenberg, conceding that subject merchandise capture "audio and video"); id. at 165:10–12 (subject merchandise converts captured images into "digital signal."); see id. at 168:6–10; Joint Uncontested Facts at ¶ 1 (subject merchandise compress and transmit the digital signals to computer so that they can be sent over internet).

The ENs, which as noted above, offer persuasive guidance and are generally indicative of the proper interpretation of the tariff schedule, specifically reference "webcams" in the notes for Heading 8525:

> **Television cameras** may or may not have an incorporated device for remote control of lens and diaphragm as well as for remote control of the horizontal and vertical movement of the camera

---

[2] Both parties agreed with these technical definitions.  See Tr. at 732:17–22 (testimony of Dr. Brian D'Andrade referencing IEEE and McGraw-Hill definitions of television cameras, and noting that television cameras do not have ability to capture or transmit audio or have compression capabilities); id. at 857:18–24 (testimony of Mr. David Elliot that "television camera" refers to device that "captures images, that transforms those images into electrical or electronic signals and that transmits those signals out to a viewer").

> (e.g., television cameras for television studios or for reporting, those used for industrial or scientific purposes, in closed circuit television (surveillance) or for supervising traffic).  These cameras do not have any inbuilt capability of recording images.
>
> Some of these cameras may also be used with automatic data processing machines (e.g., webcams).

World Customs Organization, <u>Harmonized Commodity Description and Coding System Explanatory Notes</u>, Explanatory Note, XVI-8525-2 (5th ed. 2012).

Defendant emphasizes that the ENs to 8525, with their inclusion of webcams, undercuts Plaintiff's argument that their Webcams or ConferenceCams are not properly classified as television cameras in Heading 8525.   Defendant also notes that Heading 8525 explicitly covers "cameras," and that Plaintiff's merchandise abbreviate "camera" in their names, Webcam and ConferenceCam, and do meet the aforedescribed definition of television cameras.  One can understand how a webcam used to broadcast one-way video would find its way into the ENs for television cameras.  As an <u>eo nomine</u> provision, the term "television cameras" includes all forms of the named article, and if the court accepts that webcams are televisions cameras, the provision then covers all forms of webcams for whatever use, even those used for purposes unrelated to one-way broadcasting, such as those used for person-to-person or multi-person communication.

Turning to the subject Webcams and ConferenceCams, they  are prima facie classifiable as television cameras under Heading 8525.  Given that, this case would have ended at summary judgment if the carve out in Heading 8517 for "transmission or reception apparatus … of heading 8525" were applicable.   Cf. <u>ADC Telecomms.</u>, 916 F.3d at 1022–23.  However, both parties agree that the carve out is <u>not</u> applicable

because it is limited to the first part of Heading 8525 ("Transmission apparatus for … ") and does not apply to "television cameras."  See Pl.'s Mot. for Summ. J. at 25; Def.'s Cross-Mot. for Summ. J., at 26 n.13 ("We agree that the subject merchandise does not fall within this exclusion because it applies to the first clause of Heading 8525, HTSUS, rather than the second clause of the heading, which includes 'television cameras.'"). Therefore, classification of the subject merchandise under Heading 8517  could not be dismissed as a matter of law.  See, e.g., BenQ Am. Corp. v. United States, 646 F.3d 1371 (Fed. Cir. 2011) (reversing and remanding lower court classification under eo nomine provision for failure to address principal use under competing tariff provision).

For the court to dismiss the applicability of Heading 8517, the court must first undertake a principal use analysis and conclude that Plaintiff's Webcams and ConferenceCams are not principally used "for the transmission … of voice, images or other data … for communication in a wired or wireless network."  Such a conclusion, however, is not easily reached.  After analyzing the Carborundum factors, the court concludes that the subject Webcams and ConferenceCams are principally used "for the transmission … of voice, images or other data … for communication in a wired or wireless network."

## B. Principal Use Findings of Fact

### 1. General Physical Characteristics

Both the subject Webcams and the ConferenceCams  contain lenses that capture light, and in turn, images.  See Tr. at 194:21–195:3 (statement describing subject merchandise by Mr. Rosenberg).  The Webcams consist of a single camera unit and

internal microphone, along with mounting clips to position the Webcam atop a computer or elsewhere to capture images at the user's desired angle.  <u>See</u> Joint Uncontested Facts at ¶ 4; PX 2–10.  The two models of ConferenceCams differ slightly.  The Orbit Ali Models contain two attachable pieces: (1) a base that contains a microphone, speaker, USB port, and on-device buttons (call, hang-up, volume controls) and (2) a circular camera that can be attached to the base directly or supported by an adjustable riser stand.  <u>See</u> PX 11. The Colossus model of the ConferenceCams contain three attachable pieces: (1) a motorized camera with an integrated microphone; (2) a speakerphone with on-device buttons including call, hang-up, and volume control; and (3) a USB-enabled hub. <u>See</u> PX 12; Tr. at 116:4–16 (direct examination of Mr. Rosenberg).  The Colossus model also includes a remote control.  <u>See</u> PX 12.  Plaintiff argues that the subject merchandise "consist of multiple components all of which working in concert enable communication." Pl.'s FOF & COL at 22.   Plaintiff notes that the subject merchandise contain omnidirectional microphones, on-board video and audio processing, mounting hardware, and are built for low latency to minimize delays in transmission of audio and video. <u>See</u> <u>id.</u>; <u>see also</u> Tr. at 74:22–75:2; 84:11–16; 102:16–25.  Plaintiff maintains that the physical characteristics of the subject merchandise point to a principal use as communication apparatus for voice and images among two or more parties.  Defendant argues that EN 85.17(II)(G) demonstrates that subject Webcams and ConferenceCams are not principally used like the other communication apparatus covered by Heading 8517 because the explanation and examples found in EN 85.17(II)(G) are focused on intermediary technical networking equipment such as modems, routers, and multiplexers,

none of which have cameras.  Def.'s COL at ¶¶ 38–40.  <u>See</u> Def.'s Br. at 15.  Nothing in the actual language of Heading 8517, however, limits the apparatus to those that perform intermediary data transmission.  <u>See</u> <u>Rubie's Costume Co. v. United States</u>, 337 F.3d. 1350, 1359 (Fed. Cir. 2003) ("Although the examples in the Explanatory Notes are probative and sometimes illuminating, [the court] shall not employ their limiting characteristics, to the extent there are any, to narrow the language of the classification heading itself.").

Plaintiff's engineer, Mr. Rosenberg, testified that the internal microphones and noise canceling capabilities are central to the use of the subject merchandise.  <u>See</u> Tr. at 85:3–25.  The subject merchandise are designed for low latency to minimize delays in transmission of audio and video.  <u>Id.</u> at 123:20–125:24.  To do so, the subject merchandise contain H.264 or MJPEG codecs for video compression, analog-digital converters, signal processors, and the ability to process and synchronize audio and video for transmission over a USB wire.  <u>See</u> Joint Uncontested Facts at ¶ 4; Tr. at 64:5–8; 105:7–10.  The camera, internal microphones, and on-board synchronization software all work together to allow for the subject merchandise to facilitate real-time communication. The physical characteristics point to use to communicate voice and images among two or more parties for videoconferencing.  Given these considerations, this factor favors classification under Heading 8517.

### 2. Use in the Same Manner as Merchandise Which Defines the Class

Plaintiff argues that the class of merchandise covered by Heading 8517 is defined by "interpersonal audio and visual communication and apparatus for data communication between devices."  Pl.'s FOF & COL at 23.  Plaintiff contends that the primary use of the

subject merchandise is for videoconferencing, which Plaintiff describes as "the penultimate form of electronic communication." Id. Plaintiff relies on an internal study, conducted in the normal course of business prior to the dates of entry of the subject merchandise, that found 72% of respondents used the subject Webcams primarily for videoconferencing. See PX 18 ("Internal Marketing Study"); Tr. at 396:5–25 (direct examination of Plaintiff's head of marketing, Ms. Joan Vandermate, and her description of Internal Marketing Study). However, as Ms. Vandermate conceded on cross-examination, the study polled consumers who use the subject merchandise for "business purposes," and not the entire market. See Tr. at 568:17–569:9. Ms. Vandermate was unable to provide an answer as to what percentage of the market for the subject merchandise is actually comprised of "business users." See id. Thus, while it is probative, the Internal Marketing Study is not itself dispositive as to the use of the merchandise.

Beyond the Internal Marketing Study, Mr. Rosenberg explained on direct examination that the principal use of the subject merchandise is "video calling and video communication." Tr. at 568:17–569:9. When asked for the basis of his knowledge as to the use of the subject merchandise, Mr. Rosenberg explained, "[i]t's how we sell them. It's what customers tell us. It's what's on the box." Id. Further, Plaintiff's expert witness, Dr. Brian D'Andrade, on direct examination, highlighted that the devices "are optimized with video compression, low latency, and audio for real-time interactive communication." Tr. at 703:23–704:4.

Defendant argues that the use which defines the class is merely transmitting and receiving data. See Def.'s Br. at 17 (relying on examples provided in EN 85.17(II)(G)).

Defendant contends that because the subject merchandise are used to "capture, convert, and transmit images to a computer," they exceed the use which defines the class of good properly classified under Heading 8517. Id. Defendant also contends that it is exceedingly rare for consumers to use the subject merchandise for audio-only calls. See Tr. at 578:22–579:7 (cross-examination of Ms. Vandermate). Defendant argues that the court should not consider this "fugitive use" in its analysis of this use provision. See Pomeroy Collection, Ltd. v. United States, 32 CIT 526, 549, 559 F. Supp. 2d 1374, 1397 (2008) (explaining that fugitive, or "atypical," use is not considered in principal use analysis). Although the record establishes that the subject merchandise is seldom used for audio-only calls, the audio function is integral to the broader (and apparently most common) use of the subject merchandise, videoconferencing. See Tr. at 85: 22–25 (Mr. Rosenberg replying "[n]ot that I know of" when asked if user can have videoconference without audio on direct). Overall, this factor favors Plaintiff's claimed classification.

### 3. Economic Practicality

The subject merchandise are sold for up to $1000. See Tr. at 202:3–13 (cross-examination of Mr. Rosenberg); 557:21–23 (cross-examination of Ms. Vandermate). At its inception, the subject merchandise were intended to compete with other more expensive video conferencing systems, which can cost upwards of $100,000. See id. at 331:13–23 (direct examination of Ms. Vandermate).

Defendant maintains that the subject merchandise does not actually replace these more expensive videoconferencing systems. Rather, they only replace the camera portion and still rely on "consumers to purchase an entire telepresence system consisting

of expensive network infrastructure."  Def.'s Br. at 18.  Ms. Vandermate testified on direct that the ConferenceCam market has drastically changed since Logitech entered in the early 2000s.  Rather than purchasing expensive infrastructure for video conferencing, consumers today ordinarily rent cloud storage through providers like Microsoft, Zoom, Webex, or Google, and then purchase the videoconferencing hardware, like the subject merchandise.  See Tr. at 333:9–336:11 (direct examination of Ms. Vandermate comparing videoconferencing market from 2006–2010 to today).  In this fragmented, multivendor market, Logitech provides a less expensive alternative than the all-inclusive, "old-school" systems provided by companies like Polycom and Cisco.  See id. at 336:12–337:9. Plaintiff apparently was at the forefront of that shift from a single-vendor environment, creating and marketing their initial Webcams and ConferenceCams as a cheaper alternative.  See id. at 337:24–338:13.  Even when the cost of a subscription to a cloud service like Zoom is included in the cost of the subject merchandise, it may present a less costly alternative to traditional video conferencing systems offered by companies like Polycom and Cisco.  See Tr. at 333:9–334:15.  Defendant argues that the price of the subject merchandise increases as the quality of the camera component increases. See Tr. at 105:19–106:3 (direct examination of Mr. Rosenberg).  Defendant therefore contends that it would be impractical to use the subject merchandise in a similar manner to the "other communication devices" in EN 85.17(II)(G) because they are less expensive and merely "connect components, combine signals or convert data."  Def.'s Br. at 17. Overall, this factor supports Plaintiff's classification of the subject merchandise under Heading 8517.

#### 4. Expectations of the Ultimate Purchaser

Plaintiff contends that the ultimate purchaser expects to use the subject merchandise for videoconferencing.  Defendant argues that the ultimate purchaser expects to use the subject devices as cameras, and highlights that the term "cam" is short for camera.  Id. at 18.  Defendant highlights the importance of the camera in the subject merchandise in contrast to "the ultimate purchasers of codecs, hubs and other goods identified as 'communication apparatus' in EN 85.17(II)(G)," who "do not expect to use the goods to capture images, because these goods do not incorporate a camera."  Id. at  16.  Defendant's proof on the ultimate purchaser's expectations is lacking, relying on Plaintiff's own marketing materials, which emphasize the ability of the subject merchandise to facilitate "face-to-face" communication.  See id.; see also Tr. at 484:7–487:15 (direct examination of Ms. Vandermate).

Plaintiff demonstrated that the ultimate purchaser expects to use the subject merchandise generally for interpersonal communication, and specifically for videoconferencing.  See Tr. at 360:10–16 (Ms. Vandermate explaining on direct that users "are looking for very good video calls with clear audio that does not echo and can be heard clearly and naturally."); PX 24.  The Internal Marketing Study provides additional support for this proposition for business purchasers.  See PX 24.  Moreover, Ms. Vandermate testified that Plaintiff partners with communication platforms like Zoom for marketing purposes to assure customers that the subject merchandise will work well with the videoconferencing platform.  See Tr. 418:11–420:6 (Ms. Vandermate describing marketing partnership).  Accordingly, the court concludes that this factor supports the classification of the subject merchandise of Heading 8517.

### 5. Channels of Trade

It is undisputed that the subject merchandise is sold both directly to businesses and through consumer channels like Best Buy, Staples, and Amazon.com.  See Tr. at 362:14–20 (direct examination of Ms. Vandermate); PX 24–25.  Defendant notes that Logitech also sells the subject merchandise on its own website (see PX 3 at 13) in the "VIDEO" section of products, where Plaintiff emphasizes the ability of the Webcams and ConferenceCams to capture images.

Plaintiff contends that the channels of trade in which it operates demonstrates that it "intentionally went into the channel of trade occupied by enterprise video conferencing companies such as Cisco and Polycom" to target customers "who could not afford the more costly systems that preexisted."  Pl.'s FOF & COL at 25.  On the other hand, Defendant notes that when the subject merchandise are sold through consumer channels, the packaging is attractive and includes "pictures of images captured by the products' cameras," whereas, the products sold directly to business use a brown box format.  Def.'s Br. at 18; see also Tr. at 108:11–20 (Mr. Rosenberg describing packaging of subject merchandise when sold to non-business customers).  Overall, the information on the record submitted by the parties does not persuade the court that this factor favors either side.

### 6. Environment of the Sale

The environment of sale deals with the manner in which the subject merchandise is advertised and displayed, including accompanying accessories.  See Aromont USA, Inc., 671 F.3d at 1312.  Here, the record establishes that the subject merchandise are sold alongside other computer peripherals and gaming equipment, such as mice,

keyboards, and headsets.  <u>See</u> Tr. at 580:21–582:12; DX 78; PX 24.  Generally, Plaintiff designs a display for the subject merchandise, often with space for gaming devices and other computer peripherals and assists the retailer in determining the optimal location for the display.  <u>See</u> Tr. at 423:16–431:18 (statement of Plaintiff's head of marketing, Ms. Vandermate); PX 24–25 (example store displays for subject merchandise designed by Plaintiff for retailers).

The parties disagree about what implications may be drawn about the use of the subject merchandise itself from the devices sold alongside of the subject merchandise (<u>e.g.</u>, mice, keyboards, and headsets).  Plaintiff contends that the subject merchandise are classifiable as "other communication apparatus" under Heading 8517, evidenced by the fact that they are sold alongside other videoconferencing and video collaboration apparatus and not in the camera section.  <u>See</u> Pl.'s FOF & COL at 26.

Conversely, Defendant, relying again on a comparison to the exemplar goods in EN 85.17(II)(G), contends that the computer peripherals sold alongside the subject merchandise are not "other communication apparatus" as defined by Heading 8517. <u>See</u> Def.'s Br. at 18.  For the reasons set forth in the court's analysis of previous factors, however, the court remains unconvinced of the relevance of Defendant's comparison of the environment of sale of the exemplars in EN 85.17(II)(G) with the environment of sale of the subject merchandise.

Overall, it is unclear from the record as to whether the goods sold alongside the subject merchandise, and the manner in which the subject merchandise is advertised and displayed, demonstrate that this factor supports classification of the subject merchandise

under Heading 8517.  Plaintiff's argument relies on a comparison between merchandise in the computer peripheral section, where the subject merchandise are typically sold, as opposed to retail sections dedicated to "television cameras."  See Pl.'s FOF & COL at 16.  The fact-based analysis under Carborundum, however, considers whether the subject merchandise are commercially fungible with the goods described in the use provision.  See Carborundum, 536 F.2d at 377.  Plaintiff's arguments regarding the sale of merchandise defined as "television cameras" under the eo nomine provision of Heading 8525 are therefore of little probative value in the court's evaluation of the applicability of Heading 8517.  Thus, the court concludes that the environment of sale factor neither refutes nor supports classification of the subject merchandise under Heading 8517.

### 7. Recognition in the Trade of this Use

Under this factor, the court considers whether the merchandise is recognized in the trade as having the particular use described by Heading 8517, or whether it meets certain specifications recognized in the trade for that particular class of products. See Aromont USA, Inc., 671 F.3d at 1316.  Defendant contends that the subject merchandise are recognized as cameras in the trade, evidenced by the fact that they are designed to comply with industry standards for video resolution and framerate.  See Def.'s Br. at 16–17; Tr. at 223:19–225:6 (Mr. Rosenberg explaining on cross-examination that subject merchandise can all transmit images at 720p, "one of the standard resolutions" in industry.).

Plaintiff argues that the subject merchandise is known and accepted in the trade as "communication apparatus."  See Pl.'s FOF & COL at 26.  Plaintiff highlights its partnership with Zoom and maintains that "[t]estimony affirms that [Zoom and Plaintiff] are recognized in the trade as providers of communication systems and were so at the time of importation."  Id. at 26–27; see also Tr. at 383:11–384:8 (Ms. Vandermate explaining on direct examination that "totality of the products" produced by Plaintiff and companies like Zoom "create a communication system.").

Plaintiff's partnership with Zoom consisted of a reciprocal, co-marketing relationship whereby the products would be advertised together to consumers and at trade shows.  See Tr. at 418:11–421:17 (direct examination of Mr. Rosenberg discussing benefits of Plaintiff's partnership with Zoom).  The partnership between Plaintiff and companies like Zoom, which represent a large portion of the videoconferencing software market, demonstrate that the subject merchandise is recognized in the trade for use as communication apparatus.  This factor supports classification of the subject merchandise under Heading 8517.

In sum, given the record, including the credible testimony of Plaintiff's three witnesses—Mr. Rosenberg, Ms. Vandermate, and Dr. D'Andrade—the first, second, third, fourth, and seventh Carborundum factors support classification of the subject merchandise under Heading 8517.  The fifth and sixth factors are neutral.  Thus, the court concludes that the subject merchandise is classifiable under Heading 8517.

### C. Application of GRI 3

The subject merchandise are prima facie classifiable under both Headings 8517 and 8525. GRI 3, provides, in relevant part, that: "[w]hen … goods are, prima facie,

classifiable under two or more headings, classification shall be effected as follows: …
[t]he heading which provides the most specific description shall be preferred to headings
providing a more general description."  GRI 3(a).  In determining which tariff provision is
more specific, the court compares only the language of the headings, and looks to the
provision with requirements that are more difficult to satisfy and that describe the article
with the greatest degree of accuracy and certainty.  Orlando Food, 140 F.3d at 1440–41.

Defendant argues that the subject merchandise are classifiable under
Heading 8525 because it is more specific than Heading 8517 under the relative specificity
analysis of GRI 3(a).  See Def.'s COL at 19–21.  Defendant argues that while the "tariff
term 'television camera' is very specific, describing only cameras that capture, convert
and transmit images to a remote location … Heading 8517, on the other hand, if broadly
interpreted by the Court, could potentially cover goods that play an undefined role in the
transmission or reception of voice, images or other data."  Id. at 19–20.

Heading 8517 is a use provision that covers apparatus used "for the transmission
or reception of voice, images or other data."  The subject merchandise must be used in a
specific way to satisfy Heading 8517, while the eo nomine provision of Heading 8525
describes the article regardless of its use.  Heading 8517 has requirements that are more
difficult to satisfy and describe the article with a greater degree of accuracy and certainty.
See Len-Ron Mfg Co., Inc. v. United States, 334 F.3d 1304, 1313 (Fed. Cir. 2003) ("where
a product is equally described by both a 'use' provision and an eo nomine provision,
the 'use' provision is typically held to be the more specific of the two").  This conclusion
is reinforced by the functions and complex features of the devices which facilitate that

use.  The principal use of the subject merchandise cannot be said to be the mere capture, conversion, and transmission of images, any more than the principal use could be narrowly limited to the conveyance of audio information with the microphone.  Rather, the principal use of the subject merchandise combines these features to allow for interactive multi-person real-time communication (i.e., videoconferencing).

### IV. Conclusion

For the foregoing reasons, the court concludes that Heading 8517 provides a more specific description than Heading 8525.  In accordance with GRI 3, the court concludes that the subject merchandise are classified under Heading 8517.  Heading 8517 covers "other apparatus for the reception, conversion and transmission or regeneration of voice, images or other data …."  Subheading 8517.62.00 covers such machines "for the reception, conversion and transmission or regeneration of voice, images and other data …."  Subheading 8517.69.00 is the basket provision for Heading 8517 which would include devices that transmit but do not receive.  Since the ConferenceCams are machines "for the reception, conversion and transmission of voice, images or other data," they are properly classifiable under HTSUS subheading 8517.62.00.  Since the Webcams are machines "for the conversion and transmission of voice, images or other data," but do not receive, they are properly classifiable under HTSUS subheading 8517.69.00. Accordingly, the court will enter judgment for Plaintiff.

                                                            /s/ Leo M. Gordon
                                                            Judge Leo M. Gordon

Dated: August 24, 2021
       New York, New York